

FILED & ENTERED

APR 15 2025

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Pgarcia    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SAN FERNANDO VALLEY DIVISION

In re:

Dellita Johnson

Debtor(s).

Barbara  Gatlin

Plaintiff(s),

v.

Dellita  Johnson

Defendant(s).

CHAPTER 7

Case No.:  2:23-bk-10348-VZ
Adv No:   1:24-ap-01065-GM

**MEMORANDUM OF OPINION AFTER TRIAL**

Date:          March 6, 2025
Time:          9:30 AM
Courtroom:  302

1

2

3      In January 2023, Dellita Johnson filed a voluntary petition under Chapter 7.

4  About three months later, Barbara Gatlin filed this adversary proceeding, asserting one

5  cause of action under 11 USC §523(a)(6).  The adversary proceeding prays that the

6  damages awarded in two state court cases should be declared non-dischargeable.[1]  The

7  first case is Gatlin v. Oasis C & D Incorporated, Los Angeles Superior Court Case No.

8  BC396586 ("Gatlin I").  The second is Gatlin v. Dellita Johnson aka Delita Johnson, Los

9  Angeles Superior Court Case No. BC711889 ("Gatlin II").

10      Gatlin I is for actions and damages as described in the ruling granting summary

11  judgment to the Plaintiff.[2]  Summary judgment was denied on Gatlin II, which is based

12  on post-judgment fraudulent transfers.[3]  The current trial concerns Gatlin II.

13      The following is an excerpt from the Memorandum of Opinion on the summary

14  judgment.  It sets forth the background facts that led to the judgment in Gatlin I, as

15  stated in the Court's findings on the non-dischargeability of the Gatlin I judgment [edited

16  for typos]:

17

18      The undisputed facts are as follows, and these are based on the judgment issued

19  in what I'm calling Gatlin I, the first judgment [dkt. 75, p. 7-10]

20          Gatlin and Salazar were tenants at a property which was owned by

21      Johnson and/or Oasis. Ownership of the property alternated between Oasis and

22      Johnson. And in July '07, Johnson quitclaimed the property to Oasis as a bona

23      fide gift for no consideration. Gatlin lived in Unit A and Salazar in Unit B. There

24      were a total of three units at the property when Gatlin and Salazar moved in with

25      an interior wall that separated their units. Gatlin, who received rent assistance

26      from the City of L.A., executed a lease for $1,450 with Johnson effective

27  ---

28  [1] This adversary proceeding was filed in the Los Angeles division as case 2:23-ap-01142-SK.  It was later
    transferred to the San Fernando Valley division for trial as case 1:24-ap-01065-GM.
    [2] Adversary docket #75
    [3] Adversary docket #41

December 5, 2006, and paid a security deposit of the same amount.

During Gatlin's tenancy, there were intermittent problems with gas turnoffs resulting in no hot water or heat for days. When Gatlin complained to Johnson about this and other health and safety issues, she received slow or no response. She also complained to the L.A. Housing Department and L.A. County Department of Health.

Sometime before Gatlin occupied the property, it was converted from two units to three in violation of the L.A. Building Code. In October of '07, the L.A. Housing Department issued a Notice in Order of Abatement requiring Oasis to remedy a kitchen ventilation problem, demolish and remove an unpermitted wall partition between Gatlin and Salazar's unit, and restore the exterior from a three-unit to a two-unit configuration. There was no evidence that Johnson and/or Oasis attempted to remedy or fix the issues despite receiving notices from housing authorities regarding the property's deficiency.

In 2006 and '07, Gatlin and Salazar received a series of Notices to Quit and unlawful detainer actions were brought.

In August of 2007, Johnson, on behalf of Oasis, filed a UD action against Gatlin. Gatlin defended against the UD action by asserting habitability grounds in a rent credit that she arranged with Johnson to restart the gas services, which had been terminated due to no fault of her own, and she prevailed in that defense.

On January 11, "management," without specifying who or which entity issued a notice to Gatlin indicating,

The owners will need open access to your unit for emergency repairs and past [sic] extermination. All tenants must vacate the units for a minimum of three days due to fumigation (fumes are unsafe and construction repairs). Oasis will not be responsible for any personal items left behind. Please remove money, jewelry, and necessary clothing.

On January 13th, '08, Gatlin agreed to vacate the property and Johnson paid Gatlin $100 to defray the cost of her hotel stay. When Gatlin returned the next day, the apartment was tented and she saw uniformed men removing furniture, appliances, and other belongings from her unit. Her personal items and furniture were thrown into the backyard.

Salazar indicated she saw Johnson drive up in a U-Haul and Gatlin watched Johnson toss out her clothes. Johnson was seen destroying bathroom fixtures and demolition of the partition wall between Gatlin's and Salazar's unit had begun.

Gatlin I, which was brought against Johnson, Oasis, and Cindy Martin, included eight causes of action. As a preliminary matter, the Gatlin I court indicated that Johnson and Martin were officers of Oasis. The evidence regarding Oasis's corporate status and Johnson's relationship with Oasis established that she was personally responsible for the property. Martin was an officer and director of Oasis, but the degree of her involvement was questionable.

The Gatlin I court found it significant that Johnson quitclaimed the property to Oasis without any consideration. It concluded that Oasis was a sham corporation and was Johnson's alter ego, making her personally liable for all of its acts.

The Bankruptcy Court previously found that the judgment in Gatlin I is not dischargeable under §523(a)(6) and thus the only remaining amount to be determined by this trial is the $50,000 in non-monetary damages, which was granted for emotional distress in the Gatlin II trial.

Gatlin II concerned a series of post-judgment transfers of the Property and whether they were done to prevent Ms. Gatlin from executing on the Property so as to collect on her judgment from Gatlin I.  In Gatlin II, Judge Gail Killefer of the Superior Court found that Gatlin had a judgment lien on the real property known as 1726-1728

Leighton Avenue (hereinafter "the Property").  She then detailed the transfers of the Property and the violation of the Court's orders not to further transfer the Property. She awarded Ms. Gatlin $50,000 in non-economic damages and added that to her 50% interest in the Gatlin I damages.  This created a judgment of $284,612.09 against Defendant D International Services, LLC and Dellita Johnson (individually and as trustee of the Johnson Family Trust and The New Life Trust).  The Court also imposed a constructive trust on the Property.

The basis of the state court  judgment in Gatlin II is that after the judgment against Ms. Johnson in Gatlin I, she began a series of transfers of the Property in a successful attempt to prevent Ms. Gatlin from enforcing her judgment lien.  This continued even after the Court issued an injunction against any further transfer.  These transfers were to entities controlled by Ms. Johnson.

Building on the findings and judgment in Gatlin II, this adversary proceeding asserts that the series of transfers created a willful and malicious injury to Ms. Gatlin and thus the additional damages of $50,000 should be found to be non-dischargeable, also under §523(a)(6).

It should be noted that all parties agree that the Property is the only asset of Ms. Johnson that can be targeted for collection.

It will help to set forth a chronology of the transfers and orders:[4]

| Date | Event | id. | Comments |
|---|---|---|---|
| 12/21/2006 | Gatlin and Johnson execute a written lease for 1728A Leighton Avenue | ex. 1 | |
| 7/26/2007 | **Johnson quitclaims the Property to Oasis** for no consideration | ex. 1 | |
| 8/2007 | Johnson and Oasis file an unlawful detainer action against Gatlin | ex. 1 | |
| 10/1/2007 | The Los Angeles City Housing Department issues a notice of abatement for the Property to make repairs and restore this from a three-unit property to a two-unit property | ex. 1 | |

[4] The various entities are identified in slightly different ways on the documents.  The chronology uses the form set forth on each document referred to.

| Date | Event | id. | Comments |
|------|-------|-----|----------|
| 11/2007 | Johnson and Oasis file an unlawful detainer action against Salazar in 1728B Leighton Avenue | ex. 1 | |
| 1/11/2008 | "Management" issues a notice to Gatlin and to Salazar to vacate for at least 3 days due to fumigation | ex. 1 | |
| 1/13/2008 | Gatlin and Salazar each vacate their apartments | ex. 1 | |
| 1/14/2008 | Gatlin and Salazar become aware of their personal property being removed and that Johnson was destroying bathroom fixtures and the partition wall between their units | ex. 1 | |
| 4/7/2008 | **Self Evident Incorporated** is created. Johnson is agent for service of process.  Bessie Johnson [Dellita Johnson's mother] is one of the signers and she uses the same Los Angeles address as Dellita Johnson – 5207 Cimarron St. However, Dellita Johnson uses the address of 4833 Kansas, Suite 202, San Diego as her address as the initial agent for service of process.  This is also the address of Arthur W. Green, the third signer. | ex. 3 | |
| 8/19/2008 | Gatlin and Salazar file suit against Oasis, Johnson, and Martin [Gatlin I] | LASC BC396586 | |
| 1/30/2009 | Judgment for Gatlin and Salazar against Oasis and Johnson. Oasis found to be a sham corporation and the alter ego of Johnson | LASC BC396586; ex. 1 | |
| 8/12/2010 | Abstract of Judgment issued | LASC BC396586 | |
| 9/10/2010 | Abstract of Judgment recorded in Los Angeles County | LASC BC396586 | The Court does not have a copy of the recorded abstract, but there is a statement of this finding in Gatlin II (ex. 20) |
| 6/6/2011 | **Johnson transfers the Property to Self Evident Inc.** as a bona fide gift for no consideration | ex. 4 | |
| 4/17/2013 | Gatlin I judgment renewed - $171,160.56 | ex. 5; ex. 6 | |
| 12/20/2014 | Glenda Curtis is disbarred | Greta Sedeal Curtis # 175248 - Attorney Licensee Search | |
| 12/23/2014 | Amended Abstract of Judgment issued | ex. 6 | Per Gatlin II, this was recorded (ex. 20) |
| 2016 | Cindy Martin introduces Glenda Curtis and Johnson | | From Gatlin II judgment (ex. 20) |

| Date | Event | id. | Comments |
|---|---|---|---|
| 6/6/2016 | **D. International Services LLC is organized by Johnson** in consultation with Curtis. Johnson is the organizer and agent for service of process.  Curtis later asserts that she is the managing member. More than one manager is allowed under the Articles of Organization | ex. 7; ex. C | From Gatlin II judgment (ex. 20) |
| 8/21/2017 | **Johnson and Self Evident INC. transfer the Property to D. International Services, LLC** as a gift for no consideration. Per Curtis, D. International Services LLC purchased no other real property until 2019 | ex. 8 | From Gatlin II judgment (ex. 20) |
| 5/3/2018 | Dahya Sanchez sends a letter to Gatlin on behalf of Johnson offering to settle for $2,500 or Johnson will file bankruptcy | ex. 9 | |
| 6/28/2018 | Gatlin files a complaint for fraudulent transfer against Johnson and D. International Services, LLC | LASC BC711889 | Gatlin II |
| 8/27/2018 | TRO issued to restrain further transfers of the Property | LASC BC711889; ex. 10 | |
| 1/10/2019 | Preliminary injunction issued retraining further transfers - Johnson present at the hearing | LASC BC711889; ex. 11, 12 | |
| 2019 | According to Curtis's testimony in Gatlin II, in 2019 D International Services, LLC purchased one other piece of property (for $315,000), which was at 240 W. 54th St., Los Angeles. D International Services, LLC then rented it to Self-Evident, Inc., which contracted with the State of California to provide room and board to disabled individuals who were clients of the State of California Regional Centers. | | Gatlin II judgment. It is unclear whether (1) only Leighton was rented to Self-Evident or (2) both 54th St and Leighton or (3) only 54th St. Curtis also mentioned a time share. |
| 2/12/2020 | **D. International Services, LLC** changes its name to **D & G International Investment Services, LLC.** Per Curtis, D & G was for "Delita and Greta" | ex. C | Curtis testimony in Gatlin II |
| 7/2/2020 | Greta Curtis sends email to Johnson at Self Evident that she is in negotiations with Gatlin to sell the Property and intends to give the notices to enter and appraise the Property and threatens to evict Johnson if she interferes or damages the Property | ex. A | |
| 7/29/2020 | Johnson creates The New Life Living Trust, U/A dated 7/29/2020 | ex. 14 | |
| 7/29/2020 | **D. International Services LLC quitclaims its interest to Johnson** | ex. 13 | Recorded 8/5/20 |
| 7/29/2020 | **Johnson transfers her interest in the Property to herself as trustee of The New Life Living Trust, U/A dated 7/29/2020.** | ex. 14 | Recorded 8/5/20 |

| Date | Event | id. | Comments |
|------|-------|-----|----------|
| 6/23/2021 | **Johnson, as trustee of The New Life Living Trust, transfers the Property to D. International Services LLC.** Johnson claims that she did not know of the injunction and so the 7/29/2020 transfer was an error and she is now correcting the mistake. | ex. 15 | This grant deed is recorded on 7/27/21 |
| 8/9/2021 | Default entered against Johnson in Gatlin II | BC711889, ex.19 | |
| 7/21/2022 | Gatlin I judgment renewed - $437,409.10 | ex. 17, 18 | |
| 1/23/2023 | bankruptcy case filed | 2:23-10348 | |
| 3/13/2023 | **Greta Curtis , as managing member of D. International Service, LLC, aka D&G International Investment Services, LLC, executes a quitclaim deed for no consideration to Amarillo Glendon 02 LLC stating that the grantors and grantees have the same parties in the same percentages** | ex. B | |
| 3/27/2023 | Judgment entered in Gatlin II. The court finds that D International Services, LLC was the alter ego of Johnson and Curtis. D International Services, LLC was formed to allow Johnson and Curtis to continue to profit from ownership of Leighton by avoiding the judgment lien. | BC711889, ex.20 | |
| 4/24/2023 | Adversary proceeding filed | 2:23-ap-01142 | |
| 5/19/2023 | Relief from Stay is granted to proceed in state court in Gatlin II | 2:23-bk-10348 | |
| 5/22/2024 | Summary judgment granted on LASC BC396586, denied on LASC BC711889 | | |
| 12/5/2024 | transfer of adversary proceeding to SFV | 1:24-ap-01065 | |

The evidence in this adversary proceeding comes from two sources: the testimony and documents placed before the Court in the adversary proceeding and the evidentiary basis of the judgment in BC711889 (Gatlin II).  Although the Court does not have a transcript of the state court trial in Gatlin II, the findings are set forth in the Judgment After Bench Trial filed on March 27. 2023.[5]  As laid out below, this Court can use the findings in the state court judgment to provide facts upon which to base its findings in this adversary proceeding.

The history of these transfers is confusing and made even more confusing by the

---

[5] Ex. 20

-8-

testimony of Johnson in this trial and the testimony of Curtis in Gatlin II.  But it appears that the above chronology is a basically correct recitation of the facts.[6]

Self Evident Inc (Self Evident) was incorporated in California in April 2008, which was four months before Gatlin I was filed, but three months after the events occurred that led to the judgment against Johnson in Gatlin I.  Although Dellita Johnson was the incorporator and agent for service of process, her mother (Bessie Johnson) was one of the signers of the Articles of Incorporation.[7]  Ms. Johnson testified that Self Evident was her mother's company and that her mother used it to rent properties to seniors. Although Self Evident was incorporated in California, it appears that Bessie Johnson may have been living in Florida at the time and during the next few years.

Johnson told two stories as to why she transferred the Property to Self Evident. In one she testified that the transfer was made because her mother fronted the cost to repair the Property when Ms. Gatlin's unit had been destroyed and the work was needed to bring the building back up to code.  According to Dellita Johnson, this cost over $80,000 and that was the payment that Bessie Johnson made to purchase the building for Self Evident. The timing of the transfer does not support this.  The creation of Self Evident took place in April 2008, three months after the repairs of January 2008, and the transfer to Self Evident took place in June 2011, which was three years after that.

Dellita Johnson's other explanation was that at some point she lived in one of the two units on the Property and the other was vacant.  Then her mother, who had previously lived in Florida, moved into the Property.  Self Evident was her mother's company, which rented out units for senior housing. Because her mother utilized the apartment on Leighton for her rental business, her mother paid the mortgage and

---

[6] Ms. Johnson testified that at some point she brought a criminal action against Gatlin for damage to the property.  Johnson lost. No date was given. Johnson testified that she did not pay anything to Gatlin for two reasons: the market had crashed and she did not have the money.  Also, because she was not successful in the criminal action due to the fact that she could not introduce the videotape into evidence. So she decided that she was not going to pay. [testimony on March 6, 2025 at 10:02 a.m.]

[7] Ex. 3

1   Johnson did not receive any money or anything else.  She testified that her mother paid

2   the mortgage directly and her mother received and kept any rents that were paid

3   (presumably from the other unit on Leighton and any properties that she rented as part

4   of her business).[8]

5        Ms. Johnson testified that when she transferred the Property to Self Evident in

6   June 2011 it was not to protect against Ms. Gatlin's collection efforts, but to protect

7   herself from personal liability to future tenants.  However, the facts do not support this in

8   that she also testified that she owned no other real property, that she (and later her

9   mother) lived in one of the units, and that the other unit was empty during all or much of

10  this period.[9]

11       As to the transfer from Self Evident to D. International Services, LLC (D.

12  International or D. International Service), Ms. Johnson testified that she and Self

13  Evident did this when her mother stopped operating her rental business.  She testified

14  that D International Services was a limousine company whose business it was to take

15  people to the airport or other locations.  It did not operate the Leighton property and

16  apparently no rents were collected for the Leighton property.  There were few profits

17  from D International Services and those were used to pay the mortgage for Leighton

18  Avenue.[10]

19       This is a very different story from that told by Ms. Curtis at the Gatlin II trial as to

20  the use of the Property and the creation and business of D International Services.

21       According to Curtis's testimony in Gatlin II, in 2016 she met Ms. Johnson.  Curtis

22  was a disbarred attorney and it is questionable, but not relevant, whether Johnson knew

23  of the disbarment.[11]  Almost exactly five years after the property was transferred to Self

24  Evident and shortly after Curtis and Johnson met, the two of them created D

25

26  [8] Dellita Johnson testimony, March 6, 2025, 10:05 a.m.

     [9] Id

27  [10] Id at 10:10 a.m.

     [11] Greta Sedeal Curtis # 175248 - Attorney Licensee Search. Johnson testified that she had hired Greta Curtis

28  to represent her (apparently in Gatlin II), but did not know that Curtis was disbarred.  When she found out,
Curtis had someone named Beezey take over.  The Court has no information about the timing of this or the
identity of the other attorney.

International Services LLC. (D International or D. International Services).  Johnson
signed as the organizer and agent for service of process[12], but the address that she
used was 300 East Esplanade Drive, 9th Floor, Oxnard, CA, which was the address of a
business that Johnson and Curtis used in forming D International.  Curtis drafted the
organizing documents for D International.[13]

Curtis testified that D International "purchased" Leighton Avenue from Self
Evident in 2017 for $1.00 and in 2019 D International purchased a property on 54th
Street for $315,000.  D International rented Leighton (and maybe 54th Street) to Self
Evident as its tenant and Self Evident contracted with the State of California to provide
room and board to disabled individuals who were clients of the State of California
Regional Centers.  Self Evident received $4,500 per month per client.  This money was
used by Self Evident to pay rent to D International, which made the mortgage payments.
Although Curtis testified that she received no money from D International, she did admit
to receiving a lump-sum payment of $40,000.[14]  There was no indication in the Gatlin II
judgment that Dellita Johnson received any money from Self Evident or from D
International.

Trying to make sense of this conflicting testimony is virtually impossible.  But the
undisputed evidence is that the Property was transferred first to Self Evident and then to
D International – both without the payment of any consideration.  The Property
generated some level of income and that seems to have been used to pay the
mortgage.  During this period there was no attempt to pay Ms. Gatlin and there were no
collection actions undertaken by Ms. Gatlin.

In 2018 the equity increased and so Johnson attempted to get a loan to start
paying the judgment.  Gatlin's attorney had not previously responded to Johnson's
attempts to contact him.  Dahya Sanchez was a realtor who was working on Johnson's
behalf.  She sent a letter to Gatlin's attorney with an offer of $2,500 to settle the

---

[12] Ex. 7; Ex. C
[13] Ex. 20-5, Gatlin II judgment
[14] Ex. 20-5, Ex. 20-6, Gatlin II judgment

judgment.  The letter contained a threat of bankruptcy.[15]  Six weeks later Gatlin filed a complaint for fraudulent transfer against both Johnson and D. International (Gatlin II).

On August 27, 2018, the state court issued a temporary restraining order to prevent further transfers of the Property.  This was followed on January 10, 2019 by a preliminary injunction.  Ms. Johnson was present (apparently by phone) at both hearings and knew that transfers were prohibited.  But Johnson stated that she never received the order because it was sent to a post office box for Curtis.

A year later, in February 2020, D. International Services changed its name to D & G International Investment Services, LLC. From this point things start getting even more confusing, but first of all as to the change of name.  Per Curtis, D & G was for "Delita and Greta." Curtis also testified in Gatlin II that the change of name was because D International had not paid taxes.  But there is no indication that this would protect the Property.  Nevertheless, the Property remained in the ownership of D International Services, just as it had since August 2017.

Although Johnson testified that she was told by Curtis that Gatlin II was over and therefore she could transfer the property and that it would be safer to put it in a living trust, this is not convincing.  On July 2, 2020, Curtis sent Johnson an email that she (Curtis) was in negotiation with Gatlin to sell the Property.  At this point in time, the title was in D International.  Curtis wrote to Johnson that Curtis will give the proper notices to enter and appraise it and also threatens to evict Johnson if Johnson interferes or damages the Property.[16]  Curtis signed the letter as "CEO of D & G International Investments Services, LLC. Fka D. International Services, LLC."  It appears that Johnson agreed with the claim by Curtis to be the CEO of D. International Services, LLC and that Curtis had the power of that position.

So, on July 29, 2020 Johnson undertook three actions to protect her interest in the Property from Curtis.  She transferred the Property from D International Services

---

[15] Ex, 9
[16] Ex. A

1    LLC to herself; she created The New Life Living Trust dated 7/29/2020; and she

2    immediately transferred the Property to that entity.[17]

3        Johnson and Curtis had a falling out at some point but the exact timing is

4    unknown and the July 2, 2020 email may have been part of the struggle for control.

5    There is no evidence that Curtis was actually negotiating a settlement with Gatlin that

6    would include giving her the Property or selling the Property and paying off her

7    judgment lien. It appears that the July 2, 2020 email was an attempt by Curtis to take

8    control of the Property by asserting her rights in D International.  Instead, this seems to

9    have been the trigger that resulted in Johnson transferring the Property from D&G (D

10   International) to The New Life Living Trust, which occurred just over three weeks later.

11       The Property remained in The New Life Living Trust for almost a year until

12   Johnson was reminded that it was still under the injunction.  So, on June 23, 2021, she

13   had The New Life Living Trust transfer the Property back to D. International Services,

14   LLC.  A few months later the judgment in Gatlin II was entered.

15       Two weeks before the judgment in Gatlin II was entered, Curtis recorded a

16   quitclaim deed.  This is signed by Greta Curtis, as managing member of D. International

17   Service, LLC, and it purports to transfer the Property for no consideration to Amarillo

18   Glendon 02 LLC, stating that the grantors and grantees have the same parties in the

19   same percentages. Without objection, Johnson testified that Amarillo Glendon 02 LLC is

20   owned by Curtis.  There is no evidence that this transfer was ever reversed or that

21   Johnson was ever a party to it.

22       It is clear that the Court cannot straighten out the details of these transfers.  But it

23   does not find Ms. Johnson's testimony to be convincing that she had legitimate

24   business purposes to do so.  The Property was not being used for specific businesses.

25   It did not need to be transferred for use by Self Evident to handle low income housing or

26   to contract for rental to disabled people.  It certainly was not needed for a limousine

27   business.  Once Bessie Johnson moved in, there was only a single rental unit and

28

---

[17] Ex. 13, 14

1  property management was not needed.  D International did not acquire additional

2  property for over a year after it was transferred to that entity.  The idea that the Property

3  needed to be safeguarded from a future tenant is without substance.  The concept that

4  it would be safer in a trust has no foundation.

5

6    There are three legal issues that are critical to this case: (1) Whether the Court

7  can accept the testimony of Greta Curtis as it is reported in the judgment in Gatlin II; (2)

8  Whether the transfers by Dellita Johnson were willful and malicious actions within the

9  requirements of §523(a)(6); and (3) If they did qualify under §523(a)(6), whether Ms.

10  Gatlin suffered any damages and, if so, how much.

11

12          The Curtis Testimony as Reported in the Gatlin II Judgment

13    Collateral estoppel or issue preclusion bars a party from relitigating any issue

14  necessarily included in a prior, final judgment.  Malkoskie v. Option One Mortg. Corp.,

15  115 Cal. Rptr. 3d 821, 825 (Ct. App. 2010).  When determining the preclusive effect of a

16  state court judgment, bankruptcy courts must apply, as a matter of full faith and credit,

17  that state's collateral estoppel principles.  Gayden v. Nourbakhsh (In re Nourbakhsh), 67

18  F.3d 798, 800 (9th Cir. 1995).  The burden of establishing the doctrine rests on the party

19  asserting it.  Y.K.A. Indus. v. Redevelopment Agency of City of San Jose, 94 Cal. Rptr.

20  3d 424, 440 (Ct. App. 2009); Murphy v. Murphy, 78 Cal. Rptr. 3d 784, 803(Ct. App.

21  2008).

22    Under California law, collateral estoppel applies only if all of the following

23  elements are satisfied:

24    1.  The issue sought to be precluded must be identical to that decided in the former

25       proceeding;

26    2.  The issue must have been actually litigated in the former proceeding;

27    3.  The issue must have been necessarily decided in the former proceeding;

28    4.  The decision in the former proceeding must be final and on the merits; and

5.   The party against whom issue preclusion is sought must be the same as, or in
     privity with, the party to the former proceeding.

Khaligh v. Hadaegh (In re Khaligh), 338 B.R. 817, 824-25 (B.A.P. 9th Cir. 2006) (citing

Lucido v. Super. Ct., 795 P.2d 1223, 1226 (Cal. 1990)), aff'd 506 F.3d 956, 957 (9th Cir.

2007).  Additionally, imposition of issue preclusion in the particular setting must be fair

and consistent with sound public policy.  Khaligh, 338 B.R. at 824-25.


1.   The issue sought to be precluded must be identical to that decided in the former
     proceeding

"The identical issue requirement concerns whether identical factual allegations

are at stake in the two proceedings." Murphy v. Murphy, 78 Cal. Rptr. 3d 784, 802 (Ct.

App. 2008) (internal quotation marks omitted) (citing Lucido v. Super. Ct., 795 P.2d

1223 (Cal. 1990)).  The party seeking to assert collateral estoppel has the burden of

proof and "must introduce a record sufficient to reveal the controlling facts and pinpoint

the exact issues litigated in the prior action."  Baldwin v. Kilpatrick (In re Baldwin), 245

B.R. 131, 134 (B.A.P. 9th Cir. 2000).  "'The party asserting collateral estoppel must . . .

show that the estopped issue is identical to an issue litigated in a previous action.'"

Hohu v. Hatch, 940 F. Supp. 2d 1161, 1167 (N.D. Cal. 2013).  "Reference must be

made to the pleadings and proof in each case."  Wimsatt v. Beverly Hills Weight etc.

Int'l, Inc., 38 Cal. Rptr. 2d 612, 615 (Ct. App. 1995) (citing Clark v. Lesher, 299 P.2d 865

(Cal. 1956)).

See Vandenberg v. Super. Ct., 982 P.2d 229, 237 (Cal. 1999) ("[Collateral

estoppel] may . . . preclude a party to prior litigation from redisputing issues therein

decided against him, even when those issues bear on different claims raised in a later

case." (emphasis in original)); Campbell v. McClure (In re McClure), 70 B.R. 955, 958

n.1 (Bankr. S.D. Cal. 1987) ("The doctrine of collateral estoppel, also known as issue

preclusion, provides that a question of fact which is distinctly put in issue and directly

determined as a ground for recovery by a court . . . cannot be disputed in a subsequent

1    action between the same parties, even if the subsequent suit is on a different cause of

2    action.").

3        Gatlin II sought a constructive trust on the Leighton Avenue Property and an

4    award of damages due to a series of fraudulent transfers by Dellita Johnson to avoid

5    satisfying a judgment that had been obtained by Barbara Gatlin in Gatlin I.  Gatlin

6    prevailed. In this adversary proceeding. Gatlin deals with the same transfers, but

7    focuses on whether they were willful and malicious for the purpose to avoiding

8    satisfaction of her judgment against Johnson.  Same facts … different law.

9            On the third cause of action for imposition of a constructive trust, the Court

10           will impose a constructive trust over the Leighton Avenue Property, declaring that

11           D International is an involuntary trustee of the Leighton Avenue Property and

12           holds said property for the benefit of Gatlin and non-party Rosa Salazar. "A

13           constructive trust is an involuntary equitable trust created by operation of law as

14           a remedy to compel the transfer of property from the person wrongfully holding it

15           to the rightful owner." (PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser,

16           Weil & Shapiro, LLP (2007) 150 Cal.App.4th 384, 398.) Imposition of a

17           constructive trust prevents unjust enrichment and prevents a person from

18           benefiting from his or her own wrongdoing.

19           Before a constructive trust can be imposed, the plaintiff must prove: (1)

20           the existence of a property or some interest in property; (2) the right of a

21           complaining party to that property; and (3) some wrongful acquisition or detention

22           of the property by another party who is not entitled to it. (Id. (citations omitted.))

23           Here, Plaintiff has proven her interest and right to the Leighton Avenue Property

24           by vjrtue of the Judgment lien, and the wrongful detention of the Leighton Avenue

25           Property by Defendant D International Services, LLC, aka D & G International

26           Investment Services, LLC, Defendant Dellita Johnson aka Delita Johnson, and

27           Greta S. Curtis who repeatedly transferred the property with the intention of

28

1    placing beyond it Plaintiffs reach.[18]

2

3        2.    The issue must have been actually litigated in the former proceeding

4        The "actually litigated" requirement addresses whether the issue "was properly

5    raised, submitted for determination, and determined in that proceeding."  Happy Nails &

6    Spa of Fashion Valley, L.P. v. Su, 159 Cal. Rptr. 3d 503, 512 (Ct. App. 2013) (quoting

7    Hernandez v. City of Pomona, 207 P.3d 506, 514 (Cal. 2009)).  Although Ms. Johnson

8    decided not to defend Gatlin II and default was entered against her, this is still an actual

9    litigation of the issues in Gatlin II.  See In re Baldwin, 245 B.R. 131, 137 (B.A.P. 9th Cir.

10   2000) ("In California, it is well-established that a judgment obtained by default satisfies

11   the requirement that a judgment be actually litigated.").

12       The evidence in Gatlin II demonstrated that Dellita Johnson transferred the

13   Leighton Avenue Property multiple times for no consideration.  The transfers

14   themselves are not disputed, only the reason behind each transfer.  This is the exact

15   issue that was ruled on the Gatlin II, which found that the intent of these transfers was

16   to place the Property beyond the reach of Ms. Gatlin.

17

18       3.    The issue must have been necessarily decided in the former proceeding

19       "In order for the determination of an issue to be given preclusive effect, it must

20   have been necessary to a judgment."  Creative Ventures, LLC v. Jim Ward & Assocs.,

21   126 Cal. Rptr. 3d 564, 580 (Ct. App. 2011) (internal quotation marks and citations

22   omitted).  An issue is considered to have been "necessarily decided" in a prior

23   proceeding as long as the issue was not "entirely unnecessary" to the decision in that

24   proceeding.  Lucido v. Super. Ct., 795 P.2d 1223, 1226 (Cal. 1990).

25       The facts surrounding the transfers with no consideration and with the intent to

26   prevent Barbara Gatlin from executing on her judgment lien were determined as part of

27   the Gatlin II judgment.

28

---

[18] Ex. 20-10

4.    The decision in the former proceeding must be final and on the merits

Under California law, a judgment is not final for the purposes of collateral estoppel until it is free from the potential of a direct attack, i.e. until no further direct appeal can be taken." Geographic Expeditions, Inc. v. Estate of Lhotka ex rel. Lhotka, 599 F.3d 1102, 1105 n.3 (9th Cir. 2010) (citing Abelson v. Nat'l Union Fire Ins. Co., 35 Cal. Rptr. 3d 13, 19 (Ct. App. 1994)).  The time to appeal has long since passed.

California Rule of Court (CRC) 8.104(a) provides that a notice of appeal must be filed on or before the earliest of: 1) 60 days after the superior court clerk serves a document titled "Notice of Entry" of judgment or a file stamped copy of the judgment on the party filing the notice of appeal; 2) 60 days after a party serves a document titled "Notice of Entry" of judgment or a file stamped copy of the judgment on the party filing the notice of appeal; or 3) 180 days after entry of the judgment.

5.  The party against whom issue preclusion is sought must be the same as, or in privity with, the party to the former proceeding

Ms. Johnson is the defendant in both Gatlin II and this action.

Further, imposition of collateral estoppel in the particular setting must be fair and consistent with sound public policy.  The "public policy" requirement is a mandatory "additional" inquiry into whether imposition of issue preclusion would be fair and consistent with sound public policy.  Khaligh v. Hadaegh (In re Khaligh), 338 B.R. 817, 824-25 (B.A.P. 9th Cir. 2006).  "[T]he public policies underlying collateral estoppel— preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation—strongly influence whether its application in a particular circumstance would be fair to the parties and constitute sound judicial policy."  Lucido v. Super. Ct., 795 P.2d 1223, 1226 (Cal. 1990).

Choosing to file bankruptcy was in the sole discretion of Ms.Johnson.  That, of course, required Ms. Gatlin to file this adversary proceeding. Although Ms. Johnson had

1    an opportunity to participate in Gatlin II she chose to disregard it.  However, she has

2    been fully involved in this adversary proceeding.

3         For the above reasons, the Court accepts the testimony recounted in the Galtin II

4    judgment (ex. 20).

5

6    <u>Whether the transfers by Dellita Johnson were willful and malicious actions within the</u>

7    <u>requirements of §523(a)(6)</u>

8         A discharge under §727 does not discharge an individual debtor from any debt

9    "for willful and malicious injury by the debtor to another entity or to the property of

10    another entity." 11 U.S.C. §523(a)(6). In brief summary, the act must have been both

11    willful and maliciously caused the injury. Willful injury and malicious injury are two

12    separate things, each with its own standard.

13         A deliberate and intentional act that leads to injury is not sufficient. There must

14    be a certainty or almost certainty that harm will result from the intentional act. *See*

15    *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), and later cases interpreting it.

16         "The willful injury requirement of §523(a)(6) is met when it is shown either that

17    the debtor had a subjective motive to inflict the injury or that the debtor believed that

18    injury was substantially certain to occur as a result of his conduct." *In re Jercich*, 238

19    F.3d 1202, 1208 (9th Cir. 2001).

20         A "malicious" injury involves "(1) a wrongful act, (2) done intentionally, (3) which

21    necessarily causes injury, and (4) is done without just cause or excuse." *In re Bammer*,

22    131 F.3d 788, 791 (9th Cir. 1997).

23         The multiple transfers of the Leighton Avenue Property could only have been

24    triggered by the judgment lien that Ms. Gatlin held.  Although there is no testimony to

25    this effect, there is no other possible purpose.  Had the Property been an asset used by

26    each of the transferee entities for its own business purposes, there might be a question

27    as to the reason behind the transfers. But it was not used.  There is conflicting

28    testimony between Curtis and Johnson as to the transfer to D International Services, but

even if the Court were to believe the Curtis testimony that D International was some sort of umbrella entity between Self Evident and the California Department of Development Services, there is no evidence that either of the two units at Leighton Avenue was rented out by Self Evident.  Bessie Johnson lived in one and Dellita Johson lived in the other or it was empty.  But even if one of the Leighton Avenue units was rented out, there was no logical or legal reason that Self Evident needed to hold title.  And there is no evidence to support the claim that D International needed to own the Property rather than having Self Evident continue to own it.  Self Evident had been operating for over three years before title was transferred to it and there is no evidence that anything had changed.

Clearly Ms. Johnson intended to prevent Ms. Gatlin from executing on the property and she believed that the transfers would help her do this.  So, the transfers meet all of the requirements except whether an injury actually occurred.


<u>Whether Ms. Gatlin suffered any damages from the transfers and, if so, how much</u>

The evidence clearly shows that Ms. Gatlin took no action to execute on her judgment lien.  Even after the first transfer, which occurred nine months after she recorded her initial abstract of judgment, she did not seek to put a constructive trust on the Property  (probably because the Property generated little or no rent) and she did not start the execution process (possibly because there was little or no equity in the Property).  Whatever her reason, the transfers by Johnson from entity to entity did not hurt Ms. Gatlin in any way.  Her lien remained on the Property and the priority was established when she recorded her first abstract of judgment on September 10, 2010.

In the Judgment After Bench Trial in Gatlin II, Judge Killefer sets forth the law as follows:

"Under California's judgment lien law, a judgment creditor's recordation of an abstract of judgment creates a judgment lien that attaches to all real property situated in the county in which the judgment is recorded and that otherwise is

subject to enforcement of the money judgment against the debtor." (Lezine v.
Security Pacific Financial (1996) 14 Cal.4th 56, 64-65; Code Ci\'. Proc., §§
697.310, 697.340)  A judgment lien is for the amount required to satisfy the
money judgment. (Code Civ. Proc., § 697.350.) If an interest in real property that
is subject to a judgment lien is transferred or encumbered without satisfying or
extinguishing the judgment lien, the interest transferred or encumbered remains
subject to the judgment lien in the same amount as if the interest had not been
transferred or encumbered. (Code Civ. Proc., § 697.390, subd. (a).) "When real
property encumbered by a duly recorded abstract of judgment is transferred, the
transferees are charged with constructive knowledge of the encumbrance and
they take title to the property subject to the lien created by the abstract, not as
bona fide purchasers." (Federal Deposit Ins. Corp. v. Charlton {1993) 17
Cal.App.4th 1066, 1069).[19]

However, Judge Killefer makes an error of law when she says, without citation,
that when Johnson and Self Evident granted 100% of their interest in the Leighton
Avenue Property to D International as a gift, that transaction avoided the judgment lien
because no money changed hands.[20]

Logic says that this cannot be the law.  Otherwise the transfer to Self Evident
about nine months after the abstract of judgment was recorded would have vitiated the
judgment lien.  Otherwise, every judgment debtor would gift its real property to a friend
or relative to remove any judgment liens.

The opinion in *Pillet v. Kendrick*, 2020 WL 7485014, Cal. Court of Appeal, First
District, Division 3 (12/28/2020) has somewhat similar facts.  The judgment creditor
recorded his abstract of judgment and later renewed it and recorded an amended
abstract with updated figures.  When another creditor demanded payment, Kendrick

[19] Ex. 20-4
[20] Ex. 20-5

transferred the real property (his only asset) to his daughters for no consideration.  Two

years later the daughters transferred it to an LLC that Kendrick owned.

In the fraudulent transfer lawsuit, the court held that there were no damages

because the judgment lien survived the transfers and remained on the property in its full

amount:

> Here, Pillet obtained a judgment lien against the Property in
> 2006 and the lien was enforceable against the Property at all
> times, until it was satisfied or extinguished. Because a lien
> survives any transfers in title (Code Civ. Proc., § 697.390),
> the Property remained subject to Pillet's lien through the 2012
> and 2014 transfers in the same amount as if the Property had
> never been transferred. Thus, when the Kendrick Daughters
> and Juniper Twelve took title to the Property in 2012 and
> 2014 respectively, they did so subject to all liens—Pillet's lien
> and the two senior deeds of trust—that existed at the time
> of the transfers. Pillet argues he was aggrieved because the
> transfers made it "difficult, expensive, and cumbersome" for
> him to enforce the Judgment" and placed a "cloud" on title,
> thereby making the Property "further judgment-proof." The
> transfers, however, did not affect Pillet's ability to execute
> on the lien in any way; rather, he had the right to do so at
> all times.

Similarly, Ms. Gatlin suffered no damages through these multiple transfers.  She

could have executed at any time but did not do so.

The remaining issue as to damages, if they do exist, is the Gatlin II award of

$50,000 for "noneconomic damages" or any amount for appropriate damages  While it

is possible that the requirement of §523(a)(6) for harm could be met by noneconomic

damages such as some level emotional distress, the Court need not do a legal analysis of this.  There simply is no evidence to support the award.  The judgment in Gatlin II merely holds that the "Court also awards $50,000 in noneconomic damages to Ms. Gatlin."  There are no findings to support this award or this amount.  Similarly, when Ms. Gatlin testified in this adversary proceeding, she said that she was emotional due to the delays and had nightmares.  This is insufficient to award any amount for damages under §523(a)(6).

One further comment.  Even if Ms. Gatlin did suffer quantifiable damages from the Gatlin I judgment in January 2009 until the establishment of a constructive trust in March 2023, this was largely her own fault.  She did nothing to collect on her judgment except to keep it alive through renewals and recording of amended abstracts.  There may or may not have been equity to collect.  She may or may not have wanted to own this income property and manage it.  But these were her decisions or the decisions of the times.  Unlike residential property, she did not need to be concerned about claimed exemptions.  She apparently just waited until the time to act would be most beneficial to her.  She cannot lay this on the shoulders of Dellita Johnson.

The Court finds that the transfers were willful and malicious, but there are no damages to award Ms. Gatlin.

/ /

/ /

/ /

/ /

/ /

/ /

For the above reasons, the Court grants judgment to Dellita Johnson and allows the discharge of the additional award of $50,000 in the case of <u>Gatlin v. Dellita Johnson aka Delita Johnson</u>, Case No. BC711889 ("Gatlin II").  To the extent that the judgment in Gatlin II includes damages previously awarded in <u>Gatlin v. Oasis C & D Incorporated</u>,

Los Angeles Superior Court Case No. BC396586 ("Gatlin I"), those are not affected by this judgment.  They are merely a restatement of the Gatlin I judgment, which has already been determined to be nondischargeable through the motion for summary judgment.

Each party is to bear its own costs.

###

Date: April 15, 2025

_____

Geraldine Mund
United States Bankruptcy Judge